The J. I. Case Company *v.* Joyce.

$\frac{89}{110}$ $\frac{337}{460|}$

(*Knoxville.* November 5, 1890.)

1. HOMESTEAD. *Undivided interest in land not subject to.*

Homestead does not attach to undivided interests in lands, even since Act of 1879; and therefore the husband, who is head of a family, may convey such interests without the wife's joinder in his deed.

Constitution construed: Art. XI., Sec. 11.

Acts construed: Acts of 1870, Ch. 80; Acts of 1879, Ch. 171.

Cases cited and approved: Avans *v.* Everett, 3 Lea, 76; Flatt *v.* Mack Stadler & Co., 16 Lea, 371–379; Chalfant *v.* Grant, 3 Lea, 118; Spiro *v.* Paxton, 3 Lea, 75; Gill *v.* Latimore, 9 Lea, 381; Hollins *v.* Webb, 2 Leg. R., 74.

2. STARE DECISIS. *Case for its application.*

A decision of this Court which for eleven years has constituted a rule of property of frequent application affecting titles to real estate, should be adhered to after repeated recognitions by this and the other Courts of the State, regardless of whether it was originally correct or incorrect.

Cases cited and approved: Sherfy *v.* ·Argenbright, 1 Heis., 143, 144; Atkinson *v.* Dance, 9 Yer., 427; Thompson *v.* Watson, 10 Yer., 368; Smith *v.* McCall, 2 Hum., 163–166.

---

FROM GRAINGER.

---

Appeal from Chancery Court of Grainger County. JOHN P. SMITH, Ch.

G. Mc. HENDERSON and INGERSOLL & PEYTON for Complainant.

22—5 P

J. T. & J. K. SHIELDS, and R. C. SAMSELL for Respondents.

SNODGRASS, J.  We agree with the Chancellor in the conclusions reached in this case as to Joyce, and do not deem it necessary to discuss the assignments of error as to his branch of the case further than the point made that the Chancellor was in error in holding that Joyce was not entitled to homestead in the land decreed to be sold, because his interest in it was that of a tenant in common.  His decree was upon the authority of *Avans* v. *Everett*, 3 Lea, 76, decided in September, 1879, but decided under the Act of 1870, and it is earnestly and ably argued—first, that this case was originally wrong; and, second, that under our present homestead law, embodying the amendment of 1879, a homestead does exist on the undivided interest of a tenant in common in "real estate;" that these words are broad and comprehensive enough to include any interest in real estate and exempt it.

The argument is put upon the ground that our present homestead law, in consequence of the use of the term "real estate belonging to each head of a family" now included in the law by virtue of the Act of 1879, exempts the interest of a tenant in common, because, according to Kent and all other authors who ever treated of that subject, "real estate" includes the interest of a tenant in common, joint tenant, or any other interest in land.

If that were the question being considered, there would be no controversy, as there could be no debate. As no one ever did deny that proposition, it is fair to presume that no one ever will. If the Legislature of 1879 intended to protect "real estate" as such, the question was settled in 1879 and before the delivery of the opinion in *Avans* v. *Everett*. But the error of the argument results from treating the Legislature as intending to protect any interest in real estate as such, and ignoring the fact that this was not (and has been construed as not) to protect real estate at all, or any interest in it, but was and was alone to exempt a homestead (a right of occupancy upon such real estate as was owned by a head of a family, which he had converted, or was in a situation to convert and occupy as a homestead should he wish to do so). Because, before 1879, it had been necessary that real estate which was possessed by a head of a family for a home must be occupied in order to give him the homestead right, the law was then so amended as to secure a debtor a homestead in land not thus occupied, but such as he might select and appropriate to that purpose when he desired. It was intended to protect that occupied as a homestead, or owned by him in such a way that he could appropriate it as such; and of course it either must have been, or been in his hands susceptible of being, so converted into a homestead—that is, he must have had it in his exclusive possession,

or it must have been owned by him in severalty and in a condition to be so claimed, used, and appropriated, whether the estate be legal or equitable or a leasehold.

That this Act did not exempt real estate as such, or any interest in it, has been since very often adjudged and the Act held to have no extending or other effect on the law as it stood, and as an amendment, than to exempt a right of occupancy (a homestead) in real estate which was occupied or might be occupied as a home.

The use of the words "or real estate" was originally supposed by some members of the profession to exempt land, or some interest in it, and the question was soon made, but this Court repudiated that view, and held that the Act added nothing to the old law but an exemption of possession on a thousand dollars' worth of land owned by the debtor, but which he did not actually occupy, and gave him the right to select the part of his land upon which the homestead should be located and thereafter exist. *Flatt* v. *Mack Stadler & Co.*, 16 Lea, 371–379.

This case goes over the whole subject, and concludes as follows: "The whole of the Acts upon this subject should be construed together as one Act, and if there is any seeming conflict, it should be so construed as to give effect to the will of the law-making power. But we think there is no real conflict in the object and design of the several statutes, nor any purpose by the Act of

1879 to alter the then existing law further than
to give the owner of the land the power to locate
his homestead upon any part of it."

This opinion was at the April Term, 1886, and
has ever since been followed. And see 13 Lea, 622.

This ends all argument upon the broad or
comprehensive terms of the statute. It includes
no more than it did before the Act of 1879, so
far as interests in land are concerned, and leaves
the question unembarrassed by any play upon
phraseology or speculation in familiar or foreign
law.

The law is just as it was when *Avans* v. *Everett*
was decided, and the first question to be investi-
gated is, Was that case right?

In the first place, we remark it is evidently
well considered. On its face it appears to be the
unanimous opinion of the Court, but we personally
know that our present Chief Justice did not con-
cur. This, however, only shows that it was better
considered; because the dissenting view, we need
not add, was pressed, and, after all that could be
urged in argument or consultation, was rejected,
and the case decided as it was against the ex-
emption.

In the next place, it was in accordance with
the holding of numerous Courts in many of the
States, some of them of the very highest rank in
the estimation of the bar throughout the Union.
It was so decided in Massachusetts, California,
Wisconsin, and other States.

A number of references to these opinions, and much quotation from them, can be found in Thompson on Homesteads and Exemptions, Sections 182 to 185 inclusive. They need not be restated or requoted here.

Some of the other States had taken the contrary view. The author of that work advocated the contrary view. He even believed that the exemption extended to partnership realty, but admits, of course, what was not to be denied—that "the Courts have by a . very decided weight of authority settled the question" against his view. Sec. 194.

It is needless to add that the Court of this State has so settled it. *Chalfant, Cox & Co.* v. *Grant,* 3 Lea, 118; *Spiro* v. *Paxton,* 3 Lea, 75; *Gill* v. *Latimore,* 9 Lea, 381; *Hollins, Burton & Co.* v. *Webb,* 2 Leg. R., 74.

Judge Cooper, who delivered the opinion of the Court in *Avans* v. *Everett,* cites the sections referred to herein from Thompson on Homesteads and Exemptions to sustain, and in opposition to the view we have taken, and says the weight of authority under similar statutes is in accord with the conclusions of the Court in that case.

He quotes our statute, and says: "It manifestly contemplates the occupancy of a specific portion of land capable of being set apart by metes and bounds. It is impossible to apply its provisions to an undivided interest in realty. The debtor owns nothing in severalty, and the creditor could neither ascertain nor, of course, subject the re-

mainder after setting apart the homestead.    Until
the Legislature changes the provision of the law,
or makes specific provisions for the case, we see
no mode · of conceding the homestead right con-
sistently with the equally declared rights of cred-
itors."    Page 78.

This was at the September Term, 1879.    The
Court then, at that date, assuming that the weight
of authority was already with this conclusion,
added to it the precedent then made in Tennessee,
and thus added this State to the list of those in
which it was held that the interest of a tenant
in common was not exempt under the homestead
law.    For seven years that Court recognized and
followed the precedent then established, and for
four years this Court has done so.    We are now
urged to reverse it, and the authority rejected by
the Court in the 3 Lea case referred to is pressed
upon us as conclusive on the other side of the
question.    In deciding that case the Court referred
to the sections of Thompson on Homesteads and
Exemptions (Sections 180 *et seq.*), embodying both
views, and disagreed with the author of that work
as to the weight of authority.

Among the sections thus cited and rejected was
one quoted by Thompson from Freeman on Co-ten-
ancy and Partition and other works of same au-
thor, saying that "a co-tenant may lawfully occupy
every parcel of the lands of the co-tenancy, and
may employ them not merely for cultivation or for
other means of making profits, but may also build

houses and barns, plant shrubs and flowers, and surround himself with all the comforts of home. His wife and children may of right occupy and enjoy the premises with him. Upon the land of which he is but a part owner he may, and in fact he frequently does, obtain all the advantages of a home. These advantages are none the less worthy of being secured to him and his family in adversity because other co-tenants are entitled to equal advantages in the same home. That he has not the whole is a very unsatisfactory and a very inhumane reason for depriving him of that which he has."

This seems to be the stronghold of that side of the case—of the theory that the exemption of a home to the head of a family does not mean his home, exclusively his, but means that it exempts any interest which he is authorized to possess with others, although he cannot claim any distinct parcel of it as his own for a home or any other purpose, and this, too, upon the idea that he can go on any part of it, and may jointly with others use the land, and may himself improve and beautify any part or all of it. It seems that this has so little to do with the question under our statute giving a homestead to him alone who owns the home or the real estate in such way that it, or a certain part of it, can at any time be set aside to him against everybody, by three freeholders summoned by a Sheriff or Constable for that purpose only, that it would not be

The J. I. Case Company *v.* Joyce.

seriously cited on such question, and only needs statement, not refutation.

It may be true that a co-tenant can plant shrubs and flowers in a co-tenancy, while his defrauded or defeated creditor grows weeds adjacent in a rented homestead, but surely this does not make the property so adorned the home of the debtor in the sense of our homestead law, nor is there any thing in our partition law that necessarily gives to any co-tenant the portion he elects to take or beautify. The homestead which our law contemplates is a specific parcel of land owned by him, and capable, not of being partitioned in a suit in Court, but of being partitioned and set apart by metes and bounds by the three freeholders summoned by the levying officer. See 3 Lea, 78, and see for further elaboration of this question the dissenting opinion in the case of *Jackson, Orr & Co.* v. *G. W. Shelton et al., ante,* p. 82.

An argument is made that because land can be partitioned among tenants in common on application to the Courts of this State, therefore a homestead exists in favor of each one, and can be set apart to him. This is erroneous for several reasons. In the first place, all land or real estate held in such tenancy cannot be partitioned. A hundred tenants in common may own one small house or small tract incapable of being divided, much less making a homestead for each; and if this is answered that each interest might be sold

and separate proceeds invested, we reply that this would be impossible' of small interests. Suppose the interests to bring only a few dollars each; it would be totally impracticable to take each small sum and invest it in a homestead, and let the creditor sell the fee, for it is only a homestead interest in land thus bought on re-investment that is protected; the fee is to be subjected to the creditor's demand.

But it is useless to discuss our partition law. The homestead law has nothing to do with it. The homestead law has a partition method of its own. It declares that land on which such an estate of occupancy exists is one which can be and must be partitioned or sold under the action and certificate of three freeholders summoned by the levying officer, and it follows that land which cannot be so partitioned is not included. This is the argument, and it is not answered by a reply that land may be partitioned in Court in this State—a true enough proposition in itself, but having nothing to do with the question.

But if we could apply by amendment our partition law to create a homestead, the argument is (as we have already seen) vicious, because all land cannot be partitioned. There are often dozens —sometimes hundreds—of tenants in common to whom one homestead descends. It could not have been contemplated that each would be thus split up into dozens.

. Before leaving the merits of the question, it is

The J. I. Case Company *v.* Joyce.

proper to add a word respecting the sophistry of the statement quoted from Mr. Freeman, "that because a co-tenant has not the whole is a very unsatisfactory and a very inhumane reason for depriving him of that which he has." To make of this rhetoric a plain sentence, it reads: "Because the defendant has not a whole homestead is a very unsatisfactory reason for declaring that he has not a homestead." It would seem to follow, as a matter of course, that if he has not a homestead, the Court does not deprive him of any thing by saying he has not. It is neither unsatisfactory nor inhumane. On the contrary, the policy of disencumbering his small interest or large one held in common with others of the restraint against alienation which the homestead law imposes, is to his advantage, and to the general advantage, as it leaves the property free in his hands for conveyance and for credit. Nor is it inhumane to allow it to be taken in satisfaction of his debts. If he is in debt, it is because some one has trusted him, and he has received an equal value in money or other property to that which can be taken. The creditor is not to be treated as a hostile enemy who is robbing him. He too may want a home, and often would have had one could he have received his due. He may have a wife and children likewise in need. He but demands a fair show before the law to collect his debt and enable himself to acquire home and comforts, but no sentiment is wasted on him.

Whatever may be the condition to which he and his are reduced by the default of the debtor, his rights are forgotten in such sentimentality as we have quoted. But they are nevertheless as dear to him, and should be as sacred to the Courts. The loss of a real homestead is after all no extraordinary grievance. The loser is still as well off as thousands of other good men, who pay what they owe and live in rented houses. A man who yields it up to pay his honest debts, plants a flower in his rented lawn that will bloom while he lives as a token of honor, and shed a fragrance above his grave when he is gone that will endure forever. It will be a treasure to his children and children's children when the shrubs he might have planted in a co-tenancy, which he was able to keep only by allowing his debts to remain unpaid, would have decayed by lapse of time and been blown away in the revilings of those he defeated or defrauded of justice by refusing to render them their own.

Leaving the question of right, we come to the second inquiry contemplated in this opinion, and that is whether this case should be overruled as a matter of judicial policy, having tried to establish that it should not be as a matter of judicial right. Ordinarily a case which is doubtful may be examined and reviewed even after many years, but it should not be done unless clearly wrong, and the public good is to be subserved by overruling it. It is better that the law should be fixed and

certain rather than. approximately perfect. The
change of ruling on any point is more or less
evil. Often done, every thing becomes doubtful;
none can advise or act with certainty or security.
But where great evils cannot flow from reversal
of former rulings, it is of course the duty of the
Courts to reverse and follow a better and wiser
policy in exceptional cases. The contrary is true
respecting cases which have become rules of prop-
erty, and under which estates have been established,
and where land titles depend on the former con-
struction. In such case it is said, "when a de-
cision or a series of decisions has established a
rule of property, and more particularly a rule af-
fecting title to real estate which has become gen-
erally known and been acted upon, such a land-
mark should not be disturbed." *Sherfy* v. *Argen-
bright*, 1 Heis., 143, 144; and see 8 Yer., 180; 9
Yer., 427; 10 Yer., 368; 2 Hum., 163–166.

Here we have a ruling made eleven years ago,
and during the intervening time again and again
repeated and confirmed. Lawyers have advised
their clients they could safely buy and sell these
interests of tenants in common. Hundreds of
sales on executions and attachments, as well as
private sales, have been made. The change of
ruling on that question now would destroy them
all. Any person, *sui juris*, might sue to· reclaim
homestead in such interests sold at public sale
within the last seven years or longer if possession
was· not taken and adversely held by the vendees

for that period. Many such suits would be maintainable where the sales were private, while in cases of persons under disability (no lapse of time affecting their rights), suits to recover such interests sold, either at public sale under process or privately, where the wife did not join in conveying the homestead, would be maintainable, and thus we would unsettle and destroy all estates so created.

It is not the case, as put in argument for the contrary ruling, that if many have lost their property by an erroneous construction, more need not do so. This ignores the real question we have just stated. If the change, that more might not be injured, was the question, change would be praiseworthy; but that is not the question. It is whether we should, by one fell stroke, destroy titles already vested and lands improved under a former construction, for the fancied good of saving future losses.

There is no policy and less necessity for such change of construction. Everybody has acquiesced in the one given in 1879. Judge Cooper pointed out to the Legislature the situation, and called attention to the fact that additional legislation was necessary if it was desired to exempt real estate held in co-tenancy. Five sessions of the Legislature have since followed, and no change deemed wise or desirable. Nobody has demanded such change, and none has been made — no effort by anybody to disturb the law in that respect. It

The J. I. Case Company *v.* Joyce.

thus appears to have met universal approbation. Credit has been received and extended on the faith of it. The effect has been far-reaching in the change of titles and its influence on property rights and management. It is now within three months of the meeting of the next Legislature, when the evil—if such it be—for the future can be corrected without disturbing the settled transactions of the past, and it would be inexcusable for us at this time to precipitate this wide flood of trouble by a change of construction of this law. Every reason of right and policy constrains us to adhere to it and to affirm the decree of the Chancellor on this point.

We think, however, he was in error in holding Defendant Jones liable to complainant, and as to him the decree is reversed.

The cost of this Court will be divided between complainant and Defendant Joyce; that of the Court below will be paid as decreed by the Chancellor.

### DISSENTING OPINION.

CALDWELL, J.   To secure the debt sued on, Joyce mortgaged his interest in two tracts of land. That interest being an undivided one-half in one tract, and an undivided one-fourth in the other tract. Joyce and his wife now reside on the former tract, and have lived upon it as their home for

many years. The wife did not join Joyce in the execution of the mortgage. On that ground he defends this bill to foreclose, and claims homestead for himself and family in the mortgaged lands. The Chancellor denied them that right, and decreed the sale of the lands. His decree is affirmed by a majority of this Court.

In denying Joyce and his family the right of homestead, Chief Justice Turney and the writer cannot agree with the majority.

The Constitution and the statute declare that the homestead shall not be alienated without the joint conveyance of the husband and wife, where that relation exists. Con., Art. XI., § 11; Code (M. & V.), § 2935.

Therefore, when the husband attempts to convey the homestead without the joint conveyance of the wife, as in this case, his deed is ineffectual to pass the homestead right as to either of them, and will only vest the grantee with the husband's interest in reversion, expectant on the termination of the homestead right. *Marsh* v. *Russell*, 1 Lea, 543; *Kennedy* v. *Stacy*, 1 Bax., 225; *Hoge* v. *Hollister*, 2 Tenn. Ch., 612.

It follows that if the right of homestead existed in favor of Joyce in those lands *before* the execution of the mortgage, it still exists, and should be allowed. But it is held by the majority that the right did not exist in the first instance, because Joyce did not own the lands in severalty, but only as a tenant in common with others.

Chief Justice Turney and the writer do not think this construction of the homestead law justified, either by its letter or spirit. The wise and humane object of that law is to secure the shelter, the comfort, and the independence of *a home*, of limited value, to the family of all citizens who may own an estate or interest in land capable of being in any way applied, used, or enjoyed as a home.

The words of the statute are broad and comprehensive. The property around which the benefits of the exemption are thrown, is described as " a homestead, or *real estate*, in the possession of, or belonging to, each head of a family " (Code, § 2935), whether the owner's estate therein be " legal " or " equitable " or " leasehold " (Code, §§ 2937, 2938); and " each head of a family owning *real estate* shall have the right to elect where the homestead or said exemption shall be set apart, whether living on the same or not." Code, § 2936.

It is not easy to conceive how more plain and appropriate terms could have been used to embrace every kind and character of estate in lands. The term *real estate* means an estate in fee or for life in lands, and is used as synonymous with lands and tenements. 3 Kent, *401; 1 Wash. R. P., *45.

Unmistakably it embraces estates in fee owned by tenants in common, as well as estates in fee held in severalty. The statute makes no distinction. It includes all estates in land, and excludes none.

23—5 p

Estates of co-tenancy are very common in this State. They are created by our law of descent, whenever an owner of land dies intestate, leaving children, grandchildren, etc. Such estates existed when the homestead provision was incorporated into the Constitution and statute law of the State; and, being so clearly within the object and language of that provision, they must have been in the contemplation of the law-makers, and by them deemed subject to the exemption provided.

In the absence of an express declaration to that effect, we could not believe that any law-making power ever intended to extend the benefit of such an exemption to citizens owning real estate in severalty and not to those owning undivided interests as tenants in common. A law making such a distinction would, in our judgment, be both impolitic and unjust. It would be an unjustifiable discrimination in favor of some persons and against others, though alike deserving of the law's favor and protection.

Such is not our law, which, as we understand it, is distinctly *impartial*, extending the right of exemption to "each head of a family owning *real estate*," whether in fee, for life, for years, in severalty, in joint tenancy, or tenancy in common.

In *Arnold* v. *Jones*, 9 Lea, 548, it was decided that the right of homestead exemption existed in favor of a life tenant, the Court saying:

"If the homestead, the place of residence and home of the family, is protected where the head

of the family owns the fee, much more, it seems, it ought to be in favor of the poorer man, who has only an estate less valuable, liable to be determined at any time by his death."

It was also decided in *Jackson, Orr & Co.* v. *G. W. Shelton and wife, ante,* p. 82, that the right of homestead existed in a house and lot owned by husband and wife jointly as tenants by entireties. In the latter case, after holding that the comprehensive and unrestricted words "real estate" should be interpreted according to their ordinary legal meaning, the Court said:

"The nature of the estate, or extent of the title of the beneficiary, was not of the essence of the scheme. The purpose was to stay the hand of the creditor as against a limited amount, in value, of real estate, of *whatever character*, belonging to any citizen who should be the head of a family.    *    *   *    Why not include the head of a family who owns land as tenant by entirety with his wife in the scope of a law whose purpose is so humane and commendable? To the extent of his interest he can use the land for the shelter, support, and benefit of his family in the same manner as could another man owning the absolute fee. He stands in the same or greater need of the law's favor. Is he any the less deserving of protection because he does not own the whole estate? Or is the officer of the law to take what he has because he has not more? Manifestly not. The protection of such an interest is

clearly within the spirit and letter of the statute. We can conceive. no satisfactory reason why the Legislature should not have intended to embrace in this wholesome provision *all present interests in land* naturally embraced in the language used in the Act."

An eminent text-writer says: "The homestead laws have an object perfectly well understood, and in the promotion of which Courts may well employ the most liberal and humane rules of interpretation. This object is to assure to the unfortunate debtor, and his equally unfortunate but more helpless family, the shelter and the influence of home. A co-tenant ' may lawfully occupy every parcel of the lands of the co-tenancy. He may employ them not merely for cultivation, or for other means of making profit, but may also build houses and barns, plant shrubs and flowers, and surround himself with all the comforts of home. His wife and children may, of right, occupy and enjoy the premises with him. Upon the land of which he is but a part owner, he may, and in fact frequently does, obtain all the advantages of a home. These advantages are none the less worthy of being secured to him and his family in adversity, because the other co-tenants are entitled to equal advantages in the same home. That he has not the whole is a very unsatisfactory and a very inhumane reason for depriving him of that which he has." Freeman on Ex., Sec. 243.

To this view Mr. ' Thompson lends the weight

of his opinion. Thompson on H. and E., Secs. 181 and 188.

It is said, in substance, by the majority that estates of co-tenancy must be excluded from the exemption because no particular mode for the assignment of the homestead in lands held by co-tenants is expressly prescribed. To this we say the general provisions on this subject, as contained in §§ 2940, 2941, and 2944 of the Code, in connection with those then and now existing in Code, §§ 3993 and 4024, on the subject of partition and sale for division, afford the amplest direction and remedy for the allotment of homestead *in every case*, whether the claimant have an estate in severalty or in co-tenancy with others. Hence, in the absence of an express exclusion of co-tenants from the benefits of a law whose terms are so broad and whose purpose is so general, we think they should be held to be included. In our opinion it is a harsh and unwise construction that excludes such persons from the beneficial operation of a law whose provisions are, in express terms, for the advantage of " each head of a family owning real estate." Such a rule of interpretation should not be applied in this case; for the Courts, almost universally, indulge a liberal construction in favor of the right of homestead. Thompson on H. and E., Secs. 4, 7, 731; 11 Heis., 520; 9 Lea, 548; 3 Pickle, 284; *Jackson, Orr & Co.* v. *G. W. Shelton & wife, ante,* p. 82.

This liberality of construction extends as well

to the assignment of homestead as to the ascertainment of the existence of the right. By the indulgence of such rule of construction, the Courts will readily find in existing statutes all necessary means for the assignment of homestead in lands held by tenants in common. In the case before us the complainant would only have to bring the other co-tenants before the Court and have the lands partitioned in kind, if that could be done; and, if not, have them sold for division of proceeds. The interest of the debtor being thus separated from that of others, the creditor and debtor could each be protected by decree in conformity to the statute.

This might be some inconvenience to the creditor, but mere inconvenience in the assignment of homestead should not be allowed to defeat the right of exemption itself. No mere matter of inconvenience in the administration of a law can operate to its annulment. Yet, the reasons given for denying the right, by the Courts of those States which hold that homestead is not allowable in cases of co-tenancy, are reasons of convenience merely. Thompson on H. and E., Sec. 183.

The majority opinion follows the case of *Avans v. Everett*, 3 Lea, 76. But, not agreeing to the reasoning or conclusion in that case, we think it should now be overruled as contrary to the manifest purpose and plain language of the constitutional and statutory provisions for the exemption of a homestead to "each head of a family owning real estate."

The reasoning of the Court in that case is found in the following extract from the opinion.: "The statute manifestly contemplates the occupancy of a specific portion of land capable of being set apart by metes and bounds. It is impossible to apply its provisions to an undivided interest in realty. The debtor owns nothing in severalty, and the creditor can neither ascertain nor, of course, subject the remainder after setting apart the homestead." 3 Lea, 78.

To our minds the difficulty of applying those "provisions to an undivided interest in realty" is entirely removed by the statute of partition, under which one co-tenant's interest may be ascertained and separated from that of other co-tenants, either by partition in kind or by a sale of the whole land for a division of proceeds. By this means the rights of both creditor and debtor may be amply protected, while by the doctrine of that case those of the debtor are entirely destroyed and those of the creditor augmented.

The importance of uniformity and stability in judicial decisions can scarcely be exaggerated. Nevertheless, when it appears that a decision has departed from the plain mandate of the Constitution and the statute, as we believe to be true of that case, it should be overruled, and not longer followed. A decision which misinterprets a law, and renders a provision which is just and impartial in its terms both partial and unjust in its administration, as we think that one does, should be de-

parted from whenever the mistake is discovered. That many debtors have lost their homesteads under the doctrine of that case, and that reparation cannot now be made, are not sound reasons for its perpetuation, and for forcing others to undergo a like deprivation in the future.

We think that case should now be overruled, and that Joyce and family should not be driven from a place that has afforded them the shelter, comfort, and independence of a *home* so long.

Turney, Ch. J., concurs in the dissent.